1  ELIZABETH O. GILL, SBN 218311
   egill@aclunc.org
2  JENNIFER CHOU, SBN 304838
   AMERICAN CIVIL LIBERTIES UNION
3  FOUNDATION OF NORTHERN CALIFORNIA
   39 Drumm Street, San Francisco, CA 94111
4  Tel:  (415) 621-2493

5
   ARIANA RODRIGUEZ, SBN 322701
6  arodriguez@aclusocal.org
   AMERICAN CIVIL LIBERTIES UNION
7  FOUNDATION OF SOUTHERN CALIFORNIA
   1313 W. 8th Street, Los Angeles, CA 90017
8  Tel: (213) 977-9500

9
   KATE DYER, SBN 171891
10 SHANEEDA JAFFER, SBN 253449
   ADAM F. SHEARER, SBN 279073
11 ashearer@clarencedyer.com
   CLARENCE DYER & COHEN LLP
12 899 Ellis Street, San Francisco, CA 94109
   Tel:  (415) 749-1800
13

14 Attorneys for Proposed Defendant-
   Intervenor GSA Network
15

16                 UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18                       SAN JOSE DIVISION

19

20 JESSICA KONEN and A.G., her minor        Case No.: 22-cv-05195-EJD
   child,
21                                          **DECLARATION OF ADAM F. SHEARER
              Plaintiffs,                    IN SUPPORT OF PROPOSED
22        vs.                                DEFENDANT-INTERVENOR GSA
                                             NETWORK'S REPLY IN SUPPORT OF
23 LORI CALDEIRA, KELLY BARAKI,             MOTION TO INTERVENE**
   KATELYN PAGARAN, and SPRECKELS
24 UNION SCHOOL DISTRICT,                    Hearing Date: April 13, 2023
                                            Time: 9:00 a.m.
25            Defendants.

26

27

28

I, Adam F. Shearer, declare as follows:

1.      I am an attorney duly licensed to practice before all the courts of the State of California. I am an attorney with the law firm of Clarence Dyer & Cohen LLP, counsel for Proposed Defendant-Intervenor GSA Network.  I have personal knowledge of the information set forth below, and, if called as a witness, I could and would competently testify thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Memorandum in Support of Preliminary Injunction filed in *Regino v. Staley*, 23-00032, in the Eastern District of California on January 25, 2023.

I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on January 27, 2023 in San Francisco, California.


                                        ____*/s/ Adam F. Shearer*_____
                                        Adam F. Shearer

DECLARATION OF ADAM F. SHEARER ISO GSA NETWORK'S REPLY

# Exhibit A

HARMEET K. DHILLON (SBN 207873)
MICHAEL A. COLUMBO (SBN 271283)
**DHILLON LAW GROUP INC.**
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Email: Harmeet@DhillonLaw.com
           MColumbo@DhillonLaw.com

MARK TRAMMELL*
JOSHUA W. DIXON (Admitted Pro Hac Vice)
ERIC A. SELL (Admitted Pro Hac Vice)
**CENTER FOR AMERICAN LIBERTY**
1311 South Main Street, Suite 302
Mount Airy, MD 21771
Telephone: (703) 687-6200
Email: MTrammell@LibertyCenter.org
           JDixon@LibertyCenter.org
           ESell@LibertyCenter.org

*Attorneys for Plaintiff*
AURORA REGINO

*Pro Hac Vice Motion Forthcoming

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **AURORA REGINO,**<br><br>    **Plaintiff,**<br><br>    **vs.**<br><br>**SUPERINTENDENT KELLY STALEY, in her official capacity; CAITLIN DALBY, in her official capacity; REBECCA KONKIN, in her official capacity; TOM LANDO, in his official capacity; EILEEN ROBINSON, in her official capacity; and MATT TENNIS, in his official capacity,**<br><br>    **Defendants.** | **Case No.: 2:23-cv-00032-JAM-DMC**<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: February 28, 2023<br>Time: 1:30 p.m.<br><br><br>Complaint Filed: January 6, 2023<br>Trial Date: Not Yet Set |

## TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................. 1

I.   BACKGROUND ON GENDER DYSPHORIA ........................................................ 1

A. Terminology ............................................................................................. 2

B. The Vast Majority of Children with Gender Dysphoria Desist. ................. 2

C. The Treatment of Gender Dysphoria in Children. ..................................... 3

D. Social Transitioning is a Form of Psychological Treatment. ..................... 3

II.  THE PARENTAL SECRECY POLICY .................................................................. 5

A.    A.S. Begins Experiencing Emotional Difficulties in Fifth Grade. ........... 6

B.    The District Socially Transitions A.S. ..................................................... 7

C.    Ms. Regino Learns of A.S.'s Social Transition. ....................................... 7

D.    The Threat to Ms. Regino is Ongoing. .................................................... 8

ARGUMENT ................................................................................................................. 9

I.   MS. REGINO IS HIGHLY LIKELY TO SUCCEED ON THE MERITS ........................ 9

A. Parents Have the Right to Direct Their Children's Upbringing. .................. 9

B. On its Face, the Policy Violates Ms. Regino's Parental Rights. ................ 11

1.   The Policy Implicates the Core of Ms. Regino's Rights. ............... 11

2.   The Policy Does Not Satisfy Strict Scrutiny. ................................ 15

3.   In the Alternative, the Policy is Procedurally Defective. ............... 17

C. The Policy Violates Ms. Regino's Parental Rights as Applied. ................ 18

II.  MS. REGINO FACES IRREPARABLE HARM ...................................................... 19

III. THE EQUITIES TIP DECIDEDLY IN MS. REGINO'S FAVOR ................................ 19

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST ................................................. 20

V.  NO BOND SHOULD BE REQUIRED ................................................................. 20

CONCLUSION .............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arnold v. Bd. of Educ. of Escambia Cnty.*,
  880 F.2d 305 (11th Cir. 1989) ................................................................. 9, 10
*Bellotti v. Baird*,
  443 U.S. 622 (1979) ................................................................................. 15
*Bendiburg v. Dempsey*,
  909 F.2d 463 (11th Cir. 1990) ................................................................. 10
*Brokaw v. Mercer Cnty.*,
  235 F.3d 1000 (7th Cir. 2000) ........................................................ 16, 17, 19
*Croft v. Westmoreland Cnty. Child. & Youth Servs.*
  103 F.3d 1123 (3d Cir. 1997) .............................................................. 16, 19
*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) .................................................................... 19
*Deanda v. Becerra*,
  No. 2:20-CV-092-Z, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022) ............. 10
*Doe v. Heck*,
  327 F.3d 492 (7th Cir. 2003) .................................................................... 15
*Drollinger v. Milligan*,
  552 F.2d 1220 (7th Cir. 1977) .................................................................. 10
*Eknes-Tucker v. Marshall*,
  No. 2:22-CV-184-LCB, 2022 WL 1521889 (M.D. Ala. May 13, 2022) .......... 13
*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................. 19
*Fields v. Palmdale Sch. Dist.*,
  427 F.3d 1197 (9th Cir. 2005) ................................................................. 10
*Franz v. United States*,
  707 F.2d 582 (D.C. Cir. 1983) ......................................................... 9, 11, 15
*Green v. Miss United States of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ................................................................... 16
*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) ................................................. 10, 11, 12, 13, 15
*H. L. v. Matheson*,
  450 U.S. 398 (1981) ...................................................................... 9, 11, 13, 15
*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .................................................................... 19
*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
  927 F.3d 396 (6th Cir. 2019) .................................................................... 10
*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .................................................................... 19
*Mercer, Fraser Co. v. Cnty. of Humboldt, Cal.*
  2008 WL 4344523 (N.D. Cal. Sept. 22, 2008). ........................................ 20
*Nunez by Nunez v. City of San Diego*,
  114 F.3d 935 (9th Cir. 1997) .................................................................... 15

Memorandum in Support of Motion for          Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

*Parham v. J.R.*,
    442 U.S. 584 (1979)................................................................9, 10, 12, 13, 15
*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925)................................................................................9
*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012)...................................................................9
*Prince v. Massachusetts*,
    321 U.S. 158 (1944)................................................................................9
*Riley's American Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022).....................................................................20
*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..............................................................................12
*Sanders Cty. Republican Cent. Comm. v. Bullock*
    698 F.3d 741 (9th Cir. 2012)....................................................................19
*Seal v. Morgan*
    229 F.3d 567 (6th Cir. 2000)....................................................................15
*Smith v. Org. of Foster Families For Equal. & Reform*,
    431 U.S. 816 (1977)..............................................................................12
*Stanley v. Illinois*,
    405 U.S. 645 (1972)..............................................................................15
*Tatel v. Mt. Lebanon Sch. Dist.*,
    No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)...............................11
*Thomas v. Cnty. of Riverside Sheriff's Dep't*,
    2011 WL 13224841 (C.D. Cal. July 7, 2011).................................................20
*Troxel v. Granville*,
    530 U.S. 57 (2000)........................................................................9, 10, 15
*Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 2000).......................................................10, 13, 16, 17
*Washington v. Glucksberg*,
    521 U.S. 702 (1997)..............................................................................15
*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................9
*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)............................................................................9, 10


**Other Authorities**


Child Abuse and Neglect Reporting Act, Cal. Penal Code § 11164, *et seq* ................................. 16

iii

### INTRODUCTION

The United States Constitution protects parents' fundamental right to direct the upbringing of their children. This right is expansive, encompassing parents' primary authority to choose things like where to educate their children; which political, moral, and religious beliefs to instill in their children; and what medical treatment their children may receive. This right also gives parents the authority to choose whether their children's public school socially transitions them to a different gender identity.

Like many public school districts in California, the Chico Unified School District (the "District") has adopted a policy (the "Parental Secrecy Policy" or the "Policy") under which its schools will socially transition students who identify as transgender without informing the students' parents unless the child authorizes the school to do so. Ms. Regino's daughter, A.S., was an eleven-year-old girl when her elementary-school counselor socially transitioned her to a boy, arranging for District personnel to call her by a boy's name and refer to her with male pronouns. The District did not even inform Ms. Regino that it was performing this powerful psychological treatment on her daughter, much less obtain her consent. This violated her constitutional right to direct the upbringing of her child.

A.S. has returned to identifying as a girl, but there is no guarantee that will continue. Moreover, Ms. Regino's youngest daughter, C.S., also attends school in the District. Unless Defendants are enjoined from enforcing the Parental Secrecy Policy, Ms. Regino's fundamental right to direct the upbringing of her children remains under threat, both substantively and, in the alternative, procedurally. The Court should preliminarily enjoin Defendants from enforcing the Policy.

### FACTUAL BACKGROUND

### I.    BACKGROUND ON GENDER DYSPHORIA

Before discussing the facts of this case, a short discussion of the scientific principles involved will be useful.

Memorandum in Support of Motion for                    Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

## A.    Terminology

The terms "sex" and "gender" are not interchangeable. (*See* Verified Complaint, Exhibit A (Affidavit of Dr. Stephen B. Levine, dated January 5, 2023 ("Levine Aff.") ¶ 16), attached hereto as Exhibit 1.) "Sex" refers to an individual's biological reproductive capabilities while "gender" refers to the characteristics of women, men, boys, and girls that are socially constructed and mutable. (*Id.* ¶ 18.) A person's "gender identity" is the person's felt, internal, and individual experience of gender. (*Id.*) Persons with a "transgender" identity feel that their gender identity does not match their biological sex. (*Id.* ¶ 23.)

"Gender dysphoria" refers to a condition in which the mismatch between an individual's biological sex and gender identity produces psychological distress. (*Id.* (citing American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 5th ed. ("DSM-5-TR")).) Gender dysphoria is a diagnosable psychiatric condition that typically requires treatment from a mental health professional ("MHP"). (*Id.* ¶¶ 23–28, 30–36.) A person can have a transgender identity without associated psychological distress and thus not have gender dysphoria. (*Id.* ¶¶ 23, 30.) Nevertheless, a large proportion of children who have a transgender identity also have developmental and psychiatric conditions such as depression, anxiety, autism, and ADHD. (*Id.* ¶¶ 28, 114, 129, 196–98.)

## B.    The Vast Majority of Children with Gender Dysphoria Desist.

There is no medical consensus on the causes of transgender identities and gender dysphoria, although there is strong evidence they are not biologically based. (*Id.* ¶¶ 77–87.)

Regardless, the large majority of pre-pubescent children who suffer from gender dysphoria will desist—that is, lose their transgender identity—prior to adulthood. (*Id.* ¶¶ 38, 88–92, 107.) So long as children are not "socially transitioned" or given other medical interventions, the incidence of desistence prior to adulthood is approximately 80–98%. (*Id.*) "Social transitioning" refers to the active affirmation of a transgender identity. (*Id.* ¶ 12f.) In children, it includes things like calling the child by a new name, referring to the child by new pronouns, and allowing the child to use school bathrooms associated with their new gender. (*Id.*)

Memorandum in Support of Motion for                    Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

A growing body of evidence suggests that for many post-pubescent children who experience a transgender identity, that identity is often a transient phase of exploration rather than a permanent identity. (*Id.* ¶¶ 93-102.)

### C.    The Treatment of Gender Dysphoria in Children.

There are generally four approaches to treating gender dysphoria in children: the "watchful waiting," "hands off," "psychotherapy," and "affirmation" models. (*Id.* ¶¶ 37–50.) Whatever the model, it is widely accepted that the MHP should not directly challenge a child's transgender identity. (*Id.* ¶ 46.) There are, however, significant difference in these approaches.

The "watchful waiting" model seeks to allow for the fluid nature of gender identity in children to naturally evolve. (*Id.* ¶ 38.) Under this model, the MHP treats any other psychological co-morbidities without a focus on gender. (*Id.* ¶ 39.) The "hands off" model is similar to the "watchful waiting" model insofar as it allows the child's gender identity to evolve, but it provides no ongoing treatment. (*Id.*) Under the "psychotherapy" model, the MHP seeks to identify the causes of the psychological distress and to address those causes as a means of alleviating the distress. (*Id.* ¶ 40.)

The "affirmation" model is starkly different. It prescribes that any expression of transgender identity should be immediately accepted as decisive. (*Id.* ¶ 46.) A primary pillar of this model is that children should be socially transitioned to their transgender identity. (*Id.* ¶ 49.) This approach assumes that psychological co-morbidities are unrelated or will get better with transition. (*Id.* ¶ 46.)

### D.    Social Transitioning is a Form of Psychological Treatment.

Use of the "affirmation" model in children, which has only recently become en vogue, has been sharply criticized as a "one-size-fits all" approach that fails to account for the broader issues the child is facing. (*Id.* ¶¶ 49, 56–58.) Moreover, social transitioning is a significant form of "psychosocial treatment" that substantially *reduces* the number of children who desist from a transgender identity. (*Id.* ¶ 109; *see also id.* ¶¶ 87, 103-109.) In one study, fewer than 20% of boys who socially transitioned prior to puberty desisted. (*Id.* ¶ 107; *see also* E. Coleman, *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J.

3

of Transgender Health (Sept. 15, 2022) ("WPATH 2022") at S77 (citing report indicating that "detransion occurs with only a small percentage of youth five years after a binary social transition"), available online at https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644, last visited January 5, 2023, attached hereto as Exhibit 2.[1]) For this reason, before socially transitioning a child, the MHP must take account of the risks of additional "affirmative" therapy, such as puberty blockers, cross-sex hormones, and sex-reassignment surgeries, that he or she will likely undergo. (Levine Aff. ¶ 110.) These risks are significant, and include bone weakness, cardiovascular harm, depression, increased risk of suicide, decreased sexual response, and infertility, to name a few. (*Id.* ¶¶ 156–84.)

In light of the first principle of medical ethics—*i.e.*, "do no harm"—the trend in western Europe is to move away from the "affirmation" model as the first approach to treating gender dysphoria in children. (*Id.* ¶ 49–52, 76.) In the United States, the affirmation model is still dominant, but there is growing concern over its use. (*Id.*; *see also* Jonathan Chait, *Helping Trans Kids Means Admitting What We Don't Know*, NEW YORK MAGAZINE, https://nymag.com/intelligencer/article/helping-trans-kids-means-admitting-what-we-dont-know.html, attached hereto as Exhibit 3.)

### E.    Parents are Integral to their Children's Treatment.

Regardless of the treatment method, there is widespread agreement that parental involvement is crucial in treating children with gender dysphoria. Parents typically have the most information about their children's lives, including their medical history, behaviors, relationships, *etc.*, that provide insight into the child's condition. (Levine Aff. ¶ 194.) If the parents are not involved, the MHP cannot properly diagnose the child. (*Id.* ¶¶ 185–98.)

---

[1] The full WPATH Standards of Care Version 8 document is too large to file on the Court's ECF system.  Exhibit 2 thus contains only the pages Ms. Regino cites.  The full document is available online.

Memorandum in Support of Motion for                    Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

Parental involvement is also necessary for effective treatment. (*Id.* ¶¶ 199–202.) The World Professional Association for Transgender Health ("WPATH")—a scientific organization, advocacy and policy-shaping organization that promotes the "affirmation" model for children—notes that "it is extremely helpful for parents/guardians to participate . . . in the psychotherapy process involving prepubescent children as family factors are often central to a child's well-being." (WPATH 2022 at S73; *see also id.* at S44 (noting the "importance of parental/caregiver involvement" in the "care of . . . young adults")).)

Not even WPATH recommends social transitioning *every* child who asserts a transgender identity, but if social transitioning is chosen, there is consensus that parents must be involved. For a child to inhabit different gender identities at home and school is "inherently psychologically unhealthy." (Levine Aff. ¶ 201.) Moreover, when a school secretly transitions a child, the conflicting home and school environments can cause children to view their parents as "the enemy," disrupting both the treatment of the child and the parent-child relationship. (*Id.* ¶ 202.) As WPATH recommends, MHPs should "discuss the potential benefits and risks of a social transition *with families* who are considering it." (WPATH 2022 at S77 (emphasis added).)

Socially transitioning children without their parents' knowledge and consent also violates bedrock principles of medical ethics. (Levine Aff. ¶ 203–13.) First, because children are "cognitively incapable of giving informed consent to life-altering interventions," socially transitioning a child without parental approval is done without informed consent. (*Id.* ¶ 205.) Second, even if children could provide informed consent, school personnel generally lack "sufficient knowledge of the complexities and risks in this field" to provide them sufficient information. (*Id.* ¶ 208.) Third, because school personnel generally lack this knowledge, they themselves are unable to adequately determine whether—and what—treatment is necessary. (*Id.* ¶ 210.)

## II.    THE PARENTAL SECRECY POLICY

The District operates twenty-three schools—twelve elementary schools, four junior high schools, three high schools, and four other schools—which over 12,000 students attend. (Verified Complaint ("Compl.") ¶ 12.) The District applies the Parental Secrecy Policy at each of its schools.

5

(*Id.* ¶¶ 20, 43, 51.) Under the Policy, schools will (1) socially transition students who express a desire to live as a gender different from that associated with their biological sex while (2) keeping the social transitioning secret from their parents, unless (3) the student specifically authorizes the school to inform them. (*Id.* ¶¶ 1 n.1, 21; *see also* Verified Complaint, Exhibit F (California Department of Education FAQ on Assembly Bill 1266).)

### A.    A.S. Begins Experiencing Emotional Difficulties in Fifth Grade.

During the 2021–2022 school year, A.S. was in the fifth grade at Sierra View Elementary School ("Sierra View"), a school operated by the District. (Compl. ¶ 22.) During the fall of 2021, when A.S. was eleven years old, she began experiencing feelings of depression and anxiety. (*Id.* ¶¶ 3, 23.) These feelings were brought on by the onset of puberty and major changes in her home life. (*Id.*) In the preceding months, her grandfather had passed away and her mother was undergoing treatment for breast cancer while finishing a nursing degree. (*Id.*) As a result of these changes, and because her father is disabled, A.S. began taking on more responsibility caring for her younger sister, C.S., who was then in the second grade. (*Id.*)

Approximately once a month, Sierra View counselor Mandi Robertson would visit A.S.'s fifth-grade class. (*Id.* ¶¶ 24–25.) One frequent topic of discussion during these visits was sexuality and gender identity. (*Id.* ¶ 25.) Ms. Robertson encouraged the students to consider whether they identified as a gender different from their biological sex. (*Id.*) Ms. Robertson assured students that anyone feeling this way should embrace the feeling and come speak with her privately. (*Id.*)

A.S. took Ms. Robertson's advice. (*Id.* ¶ 26.) She began considering whether her depression and anxiety were because she was a boy. (*Id.*)

In December 2021, A.S. spoke with Ms. Robertson about her depressive state. (*Id.* ¶ 27.) At that time, A.S. did not inform Ms. Robertson about her burgeoning gender confusion. (*Id.*) Ms. Robertson invited A.S. to join a small girls' group (the "Girls Group) for arts and crafts when school started again in January 2022. (*Id.*) Ms. Robertson provided A.S. with a permission form for her mother to sign, which Ms. Regino did. (*Id.* ¶ 27–28). The permission slip was for the Girls Group only, and not for one-on-one meetings with Ms. Robertson. (*Id.* ¶ 28.)

6

**B.    The District Socially Transitions A.S.**

In early 2021, after attending one or two Girls Group meetings, A.S. went to Ms. Robertson's office for a one-on-one meeting. (*Id.* ¶ 30.) During this meeting, A.S. told Ms. Robertson that she "felt like a boy." (*Id.*) Ms. Robertson immediately expressed support for A.S.'s brand new male identity. (*Id.*) She asked A.S. if she had a boy's name picked out and whether she would like to be referred to that name and by male pronouns. (*Id.*) A.S. was unsure about this, but she felt pressured by Ms. Robertson. (*Id.*) She answered in the affirmative and told Ms. Robertson her boy's name was "J.S." (*Id.*) During this meeting, Ms. Robertson did not discuss A.S.'s depression. (*Id.*) Instead, the discussion focused solely on how to effect A.S.'s social transition to a boy. (*Id.*)

After the meeting, Ms. Robertson escorted A.S. back to class. (*Id.* ¶ 31.) Ms. Robertson informed A.S.'s teacher that A.S. was to be called J.S. and referred to by male pronouns. A.S. did not give Ms. Robertson or her teacher permission to tell others of her new name and pronouns, but soon other District employees at Sierra View began using them. (*Id.* ¶¶ 31, 34.) Every day at school, A.S. was a boy named "J.S." while at home, she was a girl. (*Id.* ¶ 34.) Despite requiring a parental permission slip for A.S. to participate in an arts-and-crafts club, the District socially transitioned A.S. from a girl to a boy without even *informing* her mother. (*Id.*)

Over the course of the spring semester, A.S. had approximately two additional one-on-one meetings with Ms. Robertson. (*Id.* ¶ 33.) These meetings focused almost exclusively on how to further A.S.'s transition to "J.S." (*Id.*) A.S. told Ms. Robertson that she wanted to tell her mother about her new identity, but Ms. Robertson was not supportive. (*Id.*) She brushed off A.S.'s request and encouraged her to speak with other family members first. (*Id.*) At no time did Ms. Robertson suggest A.S. should discuss her feelings with an MHP. (*Id.*)

**C.    Ms. Regino Learns of A.S.'s Social Transition.**

On or about April 8, 2022, A.S. told her grandmother about her new identity. (*Id.* ¶ 35.) A.S.'s grandmother informed Ms. Regino later that day. (*Id.*)

Ms. Regino was shocked that the school had socially transitioned her daughter without informing her, but she was supportive of her daughter. (*Id.* ¶ 36.) Ms. Regino is a fit parent who

7

loves her children dearly, and all she wanted was for her daughter to be happy and healthy in whatever identity she chose. (*Id.* ¶¶ 11, 26.) Had Ms. Regino been involved in the process, however, she would not have allowed Sierra View to socially transition A.S. without first seeking guidance from an MHP. (*Id.* ¶ 37.) Ms. Regino arrived at this view because of A.S.'s young age, the quick onset of A.S.'s feelings of gender confusion, the existence of other stressors in A.S.'s life, and the short duration of A.S.'s feelings. (*Id.*) After learning of A.S.'s social transitioning, Ms. Regino arranged for A.S. to begin counseling with a licensed marriage and family therapist to discuss her feelings of depression and anxiety. (*Id.* ¶ 36.)

Ms. Regino also sought answers from the District. (*Id.* ¶ 42.) Over the next few months, she had several telephone calls, in-person meetings, and email exchanges with District personnel to express her concerns and to seek a change in policy. (*Id.* ¶ 42–45, 47–49). At each meeting, District personnel rebuffed her efforts, insisting that that state law required the Parental Secrecy Policy. (*Id.*)

On October 10, 2022, Ms. Regino had an in-person meeting with District Superintendent, Kelly Staley. (*Id.* ¶ 51.) Like those before her, Ms. Staley informed Ms. Regino that state law mandated the Policy. (*Id.*) On October 31, 2022, Ms. Regino made one final effort, sending an email to Ms. Staley imploring her to abandon the Policy. (*Id.* ¶ 52.) On November 2, 2022, Ms. Staley rejected this effort, stating that the District "must work within the confines of the law." (*Id.*)

**D.    The Threat to Ms. Regino is Ongoing.**

Even before A.S. "came out" to her grandmother, she had already begun to question whether she really felt like a boy. (*Id.* ¶ 38.) Today, A.S. identifies as a girl again. (*Id.* ¶ 41.) She is still in counseling for her depression and anxiety. (*Id.*)

A.S. and C.S. both attend schools operated by the District. (*Id.* ¶¶ 7, 40, 53.) While A.S. identifies as a girl, her prior feelings of gender confusion could recur at any time. (*Id.* ¶ 41.) Moreover, the same feelings could appear in C.S., especially considering the two girls' consanguinity and similar life experiences. (*Id.*) Because the District applies the Policy at the schools Ms. Regino's daughters attend, she is subject to a real, imminent, credible, and realistic danger that the Parental Secrecy Policy will (again) be applied against her children. (*Id.* ¶¶ 54–55)

8

## ARGUMENT

The Court should preliminarily enjoin the District from enforcing the Parental Secrecy Policy. A preliminary injunction is appropriate when the plaintiff demonstrates: (1) a likelihood of success on the merits; (2) that she will be irreparably harmed absent the injunction; (3) that the balance of the equities tips in her favor; and (4) that the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court must evaluate these factors according to a "sliding scale," under which they are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam) (cleaned up).

Ms. Regino makes a strong showing on each of these factors. Thus, the Court should preliminarily enjoin the District from enforcing the Policy.

## I. MS. REGINO IS HIGHLY LIKELY TO SUCCEED ON THE MERITS

### A. Parents Have the Right to Direct Their Children's Upbringing.

Parents have a constitutional right "to direct the upbringing and education" of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925)). Under the Constitution, parents—and not the state—have the "primary role" in raising their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (concluding that "the custody, care and nurture of the child reside first in the parents"). The primacy of parents' role rests on the presumptions that (1) "parents possess what a child lacks in maturity, experience, and capacity for judgment" and (2) the "natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *see also Troxel*, 530 U.S. at 58 (noting that the law presumes "fit parents act in the best interests of their children").

Parents' primary role in raising their children gives them authority to make the "important decisions" in their children's lives. *H. L. v. Matheson*, 450 U.S. 398, 410 (1981). This includes the authority to make the "intimate decisions" in the life of the child, *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312 (11th Cir. 1989); decisions that involve the child's "self-definition," *Franz v. United States,* 707 F.2d 582, 599 (D.C. Cir. 1983); decisions that implicate

9

private "familial relationships," *Drollinger v. Milligan*, 552 F.2d 1220, 1227 (7th Cir. 1977); and

decisions that touch upon "fundamental values and . . . beliefs that parents wish to instill in their

children," *Arnold*, 880 F.2d at 312, even if those values fall outside of "mainstream" culture,

*Yoder*, 406 U.S. at 222.

　　Parental authority also extends to decisions regarding their children's health, well-being,

and medical treatment. *Parham*, 442 U.S. at 603; *Wallis v. Spencer*, 202 F.3d 1126, 1141–42 (9th

Cir. 2000) (discussing the "right of parents to make important medical decisions for their

children"); *see also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418

(6th Cir. 2019); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990); *Deanda v. Becerra*,

No. 2:20-CV-092-Z, 2022 WL 17572093, *13 (N.D. Tex. Dec. 8, 2022). In *Parham*, a minor

child's parents committed him to a mental institution without a pre-admission hearing. 442 U.S.

at 590–92. The Supreme Court rejected the child's argument that his commitment violated due

process, concluding that the presumptions of parental fitness and affection applied even if the child

disagrees with the parents' decisions. *Id.* at 604. As the Court observed, unlike parents, "[m]ost

children, even in adolescence, simply are not able to make sound judgments concerning many

decisions, including their need for medical care or treatment." *Id.* at 603.

　　While parents sometimes act outside of the best interests of their children, it would be

"repugnant to the American tradition" to assume "that governmental power should supersede

parental authority in *all* cases because of [the actions] of *some* parents." *Parham*, 442 U.S. at 602–

03 (emphasis in original). Accordingly, absent a showing otherwise, the state may not "question

the ability of . . . parent[s] to make the best decisions concerning the rearing of [their] children."

*Troxel*, 530 U.S. at 68–69.

　　Finally, parents' primary authority in the lives of their children does not stop at the

schoolhouse door. "It is not educators, but parents who have primary rights in the upbringing of

children." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000); *see also Arnold*, 880 F.2d at 312–

13. While parents do not have the right to dictate the curriculum taught at their children's schools,

*see, e.g.*, *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005), *opinion amended on

denial of reh'g sub nom. Fields v. Palmdale Sch. Dist. (PSD)*, 447 F.3d 1187 (9th Cir. 2006), when

10

a school's policies "come into conflict with the fundamental right of parents to raise and nurture their child . . . . the primacy of the parents' authority must be recognized." *Gruenke*, 225 F.3d at 305.

In *Gruenke*, for example, school officials pressured a student into taking a pregnancy test without her parents' knowledge. *Id.* at 296–97. The Third Circuit held that the officials' actions infringed her parents' right to make medical decisions for their child, noting that school officials "must not lose sight of the fact that their professional association ethical codes, as well as state statutes, must yield to the Constitution." *Id.* at 307. In short, "[p]ublic schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Id.*

### B. On its Face, the Policy Violates Ms. Regino's Parental Rights.

#### 1.    The Policy Implicates the Core of Ms. Regino's Rights.

Applying these principles here, the Parental Secrecy Policy facially violates Ms. Regino's right to direct the upbringing of her children because it authorizes the District to socially transition her children without her knowledge or consent. The Policy implicates Ms. Regino's rights in four ways, each of which is an independent basis for a constitutional violation:

***First.*** The Policy interferes with Ms. Regino's right to control the "important decisions" in her children's lives.

The decision whether to socially transition a child to a transgender identity is indisputably an "important decision[]" in the life of the child. *H. L.*, 450 U.S. at 410. Indeed, the decision goes to the very heart of a child's "self-definition" as a boy or girl. *Franz*, 707 F.2d at 599; *see also B.P.J. v. West Virginia State Bd. of Educ.*, No. 2:21-CV-00316, 2023 WL 111875, at *7 (S.D.W. Va. Jan. 5, 2023) (noting that "[g]ender identity . . . is [a] person's deeply held core sense of self'") (quoting PFLAG National Glossary of Terms (June 2022)). For this reason, the decision whether to socially transition a child is "a matter of great importance that goes to the heart of parenting." *Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, 2022 WL 15523185, at *17 (W.D. Pa. Oct. 27, 2022) (concluding that "teaching a child how to determine one's gender identity" falls within the parental right).

11

Moreover, the decision is an "intimate" one, implicating private family dynamics and relationships, that must be reserved for parents. *Arnold*, 880 F.2d at 312 (noting that the Constitution protects "the formation and preservation of certain personal relationships"); *see also Gruenke*, 225 F.3d at 307 (noting that "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority"). Parents' relationships with their children are shaped and determined by whether the child is their "son" or their "daughter," and the state may not, without parental notice and consent, alter the distinct "personal bonds" that are formed by these relationships. *Gruenke*, 225 F.3d at 305 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984)); *see also Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816 (1977) (discussing "the liberty interest in family privacy").

This conclusion is buttressed by the grave, consequential, and potentially life-altering nature of socially transitioning children. As discussed, MHPs disagree over whether social transitioning is appropriate in children considering the extremely high rate of desistence—80–98%—in the absence of social transitioning. (Levine Aff. ¶¶ 49, 56–58.) Moreover, considering the low rate of desistence after social transitioning is introduced, any decision regarding social transitioning in children must account for (1) the risk that social transitioning *itself* will result in adverse psychological outcomes and (2) the risks involved in graduated affirmative care, like puberty blockers, cross-sex hormones, and sex-reassignment surgery, which is highly likely to follow social transitioning. (*Id.* ¶ 110.) Indeed, it is precisely because of the significance of this decision that WPATH "recommend[s that] health care professionals discuss the potential benefits and risks of a social transition *with families* who are considering it." (WPATH 2022 at S77 (emphasis added).)

The Parental Secrecy Policy impermissibly disregards these considerations, taking this potentially life-altering decision out of parents' hands and placing it in the hands of District personnel. In so doing, the District "arrogat[es] . . the parental role" to itself, *Gruenke*, 225 F.3d at 306, and, ultimately, assigns decision-making authority to children, who, as a matter of law, lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. Because the Policy removes parents from the decision-

12

---

making process on this important decision and prevents them from providing their children the support and guidance they deem appropriate during this significant life event, it violates the Constitution. *Id.* at 602–05; *see also H. L.*, 450 U.S. at 410 (noting that parents' "guiding role . . . in the upbringing of their children . . . includes counseling [their children] on important decisions" in their lives).

**Second.** The Policy interferes with Ms. Regino's right to control the health, well-being, and medical treatment of her children.

As discussed, social transitioning is a significant form of psychological treatment. (Levine Aff. ¶ 109.) By socially transitioning students without involving their parents, the District is impermissibly providing children psychological treatment without parental knowledge or consent. Parents—not the state—have the authority to make decisions involving the child's medical treatment. *Parham,* 442 U.S. at 603 (rejecting the "statist notion that governmental power should supersede parental authority" in the provision of medical care); *see also Eknes-Tucker v. Marshall,* No. 2:22-CV-184-LCB, 2022 WL 1521889, at *7 (M.D. Ala. May 13, 2022) (concluding that parents were likely to succeed on claim that statute prohibiting gender-affirming care in children violated their parental rights). This right, moreover, trumps the wishes of children, who are deemed "[in]capable of making sound judgments concerning their need for medical care." *Id.*; *see also id.* at 604 ("Simply because the decision of a parent is not agreeable to a child or because it involves [medical] risks does not automatically transfer the power to make that decision from the parents to . . . the state."). The Policy impermissibly allows the District to provide students psychological treatment without the knowledge or consent of their parents.

Moreover, by concealing that the District is providing psychological treatment to students, the Parental Secrecy Policy also prevents parents from *even knowing* their children may be in psychological distress. *See Gruenke*, 225 F.3d at 306–07 (observing that "as a matter of common sense, [school] counselors should encourage communication" with parents) (cleaned up). Because of this fact, the Policy also necessarily precludes parents from *determining* the care that they believe is best for their children, a decision that lies at the core of parents' fundamental rights. *Parham*, 442 U.S. at 602; *Wallis*, 202 F.3d at 1141–42. Instead, the Policy assumes that social

13

transitioning is the only viable course of action for every child who wants it, a proposition that not even the WPATH endorses. (*See also* Levine Aff. ¶¶ 49, 56–58.) Because parents are kept ignorant about their children's condition and the treatment the District is performing on them, parents are unable to fulfill their primary role as decision-maker with respect to their children's medical treatment.

*Third*. Even if it were constitutionally permissible for the District to provide students significant psychological treatment (and it is not), by excluding parents from the process, the Parental Secrecy Policy necessarily results in students being provided substandard and medically unethical care.

As discussed, for an MHP to adequately diagnose and care for a child's gender dysphoria, the child's parents must be involved. (Levine Aff. ¶¶ 185–202.) By cutting parents out of the process, the District is necessarily providing students with inadequate care. (*Id.*) Moreover, the Policy's "one size fits all approach" of socially transitioning *any* child who asserts a transgender identity and requests social transitioning, regardless of the circumstances, fails to account for the unique facts involved in each child's situation. (WPATH 2022 at S76 (noting that social transitioning "is likely to serve a child's well-being when it takes place thoughtfully and individually *for each child*") (emphasis added).) Children often feel as if they have a transgender identity based on stereotypical and restrictive notions of what men and women can be. (Levine Aff. ¶ 27.) In such cases, education—not social transition—is the proper resolution. (*Id.*) And by cutting parents out of the process, the District creates a paradigm where students are socially transitioned at school but remain their prior gender at home, a situation that is "inherently psychologically unhealthy" and disrupts the parent-child relationship just when it is needed most. (Levine Aff. ¶¶ 201–202; *see also* WPATH S77 (noting that social transitioning for children should "take place with the support and acceptance of parents/caregivers").)

In addition, as discussed, socially transitioning students without their parents' involvement is unethical. (Levine Aff. ¶ 203–13.) Children are incapable of providing informed consent to psychological treatment, and teachers and school counselors lack the expertise both to evaluate risks of social transitioning and to communicate those risks even if students could understand them.

14

(*Id.*) On these facts, it is simply not permissible for a teacher or school counselor to make such a critical healthcare decision for a child without the parents' knowledge and consent. (*Id.*)

**Fourth**. The Policy unconstitutionally reverses the presumptions of fitness and affection that underly the parental right. *Troxel*, 530 U.S. at 68; *Parham,* 442 U.S. at 602. Indeed, by excluding parents from the decision-making process based on nothing more than the child's wishes, the Policy presumes the *opposite*—it presumes either (or both) that parents are not fit or that parents will not act in their children's best interests. Either way, the Policy violates the parental right. *Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (invalidating statute that that presumed unmarried fathers are unfit as parents); *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003) (holding parents' rights violated where state actors "not only failed to presume that . . . parents would act in the best interest of their children, they assumed the exact opposite").

2.    The Policy Does Not Satisfy Strict Scrutiny.

Parents' right to direct the upbringing of their children is a "fundamental" right. *Troxel*, 530 U.S. at 65; *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). As with other fundamental rights, state action that implicates the heart of the parental right is unconstitutional unless the state establishes that "the infringement is narrowly tailored to serve a compelling government interest." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) (cleaned up); *see also Doe*, 327 F.3d at 524–25 (applying strict scrutiny); *Gruenke*, 225 F.3d at 305–07 (same); *Seal v. Morgan*, 229 F.3d 567, 575–76 (6th Cir. 2000) (same); *Arnold*, 880 F.2d at 313 (same); *Franz*, 707 F.2d at 598, 602–03 (same). The District cannot make that showing here.

The District will likely defend the Policy on the basis of student privacy, but children do not have privacy rights against their parents. *H. L.*, 450 U.S. at 412–13 (upholding state statute requiring parental notification before performing abortion on minor); *see also Bellotti v. Baird*, 443 U.S. 622, 640 (1979) ("[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions."); *Gruenke*, 225 F.3d at 307 ("Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'"). Thus, student privacy cannot be a compelling governmental interest in this context.

Memorandum in Support of Motion for          Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

The District will also likely argue that the Policy furthers its interest in "anti-discrimination" insofar as it prevents parents from discriminating against their children who identify as transgender. But the state has no interest, compelling or otherwise, in controlling the nature of the intimate family bonds between parents and children. *Supra* at 16. In any event, a "broad formulation" of a governmental interest—such as an abstract interest in "anti-discrimination"—"alone cannot suffice" to establish a compelling interest. *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 776 (9th Cir. 2022).

Even in the context of child abuse, the state "has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000); *see also Wallis*, 202 F.3d at 1141 (same); *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997) (same). The Policy does not require the District to have any evidence of parental abuse, past or imminent, based on students' transgender identity before socially transitioning them. Rather, the Policy provides that school officials must keep parents in the dark based on nothing more than the child's say-so. (Verified Complaint, Exhibit F at Answer 7 ("[S]chools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, *including the student's family*") (emphasis added)).) This is the antitheses of narrow tailoring.

Moreover, if the District has reason to believe a student has been abused or is in imminent danger of being abused by the student's parents based on the child's transgender identity (or otherwise), California law already provides means for the District to address those concerns; indeed, the District *must* report them to California Child Protective Services. *See* Child Abuse and Neglect Reporting Act, Cal. Penal Code § 11164, *et seq.*, (outlining mandatory reporting requirements for suspected child abuse). The District may not, however, cut parents out of the loop simply because their children do not want them in it.

To the extent the District will argue that the Parental Secrecy Policy precludes *it* from discriminating against students, that argument also fails. Ms. Regino does not argue that the District may not socially transition students; instead, she argues only that the District must inform

16

parents and obtain their consent to do so. And if parents do not consent to their children's social transitioning, then that decision controls, and the District lacks any anti-discriminatory interest with respect to students whose parents do not allow them to be socially transitioned by the school.

Finally, the Policy has no lower age limit. Because the District operates elementary schools, the Policy applies to pre-pubescent children, including children *as young as five years old*. Particularly at that age, children lack the cognitive capacity to process the implications that socially transitioning will have on their lives. (Levine Aff. ¶ 205.) If a kindergartener sincerely comes to believe she has a transgender identity—say, because she has a childlike understanding of gender roles (Levine Aff. ¶ 27)—but does not want her parents to know, District personnel are required to socially transition her without informing her parents. That does not remotely satisfy narrow tailoring.

3.    <u>In the Alternative, the Policy is Procedurally Defective.</u>

Even if the Policy were narrowly tailored to serve a compelling governmental interest (and it is not), it would still violate the procedural component of the Due Process Clause. Before interfering with parental rights, procedural due process obligates the state to conduct a "thorough investigation," provide parents appropriate notice, and afford them the opportunity to be heard. *Wallis*, 202 F.3d at 1141 (citations omitted); *Brokaw*, 235 F.3d at 1019 ("[P]arental rights cannot be denied without an opportunity . . . to be heard[.]") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Croft*, 103 F.3d at 1126.)

The Policy not only allows the District to socially transition students in secret without evidence that the parents have abused or are likely to abuse their children based on their transgender identity, it also does not require the District to conduct a thorough investigation into either that question or the question of whether social transitioning is appropriate for the child; does not require that parents be given any notice of the social transitioning; and does not require that parents be given any opportunity to be heard. These failures violate procedural due process on their face.

\*      \*      \*

For these reasons, the Policy is facially unconstitutional.

17

### C.  The Policy Violates Ms. Regino's Parental Rights as Applied.

The District's application of the Policy to Ms. Regino is also unconstitutional for several reasons:

*First*, the District's application of the Policy violated, and threatens to violate, Ms. Regino's right to control the important decisions in her children's life. Social transitioning is a monumental decision in the life of a child, and by keeping Ms. Regino in the dark, the Policy has deprived and will deprive Ms. Regino of her ability to be involved in this crucial decision in her children's lives. *Supra* at 15–17.

*Second*, the District's application of the Policy presents the threat that the District will (again) provide her daughters significant psychological treatment without her knowledge or consent. *Supra* at 18–20. Moreover, socially transitioning Ms. Regino's daughters in secret will (1) preclude her from knowing her children's condition, (2) create irreconcilable tension with the ongoing care A.S. is currently receiving, and (3) preclude Ms. Regino from obtaining appropriate care for C.S. *Id.*

*Third*, the District's application of the Policy threatens to result in her daughters being provided substandard and ethically improper care. *Supra* at 19–20.

*Fourth*, the District's application of the Policy reverses the constitutionally mandated presumptions of fitness and affinity. *Supra* at 20. Ms. Regino is a fit parent and will pursue her children's best interests. Upon learning of A.S.'s gender confusion Ms. Regino did not withdraw support. In fact, she did the opposite—she sought care from a licensed MHP, which is something the District never even *suggested* A.S. should do.

The District's application of the Policy to Ms. Regino is also not narrowly tailored to achieve any compelling governmental interest. *Supra* 21–23. As a matter of law, the District has no interest, compelling or otherwise, in keeping information about Ms. Regino's daughters secret from her. Moreover, the District cannot establish that it has any anti-discrimination interest that would be served by applying the Policy to Ms. Regino. In fact, the opposite is true—Ms. Regino has demonstrated that she has no discriminatory animus towards her daughters on any basis, including but not limited to the situation where they identify as transgender, and her decision as to

their gender identity is decisive. For the same reason, application of the Policy to her is not narrowly tailored. Finally, considering Ms. Regino's daughters' young ages, application of the Policy to them is particularly inappropriate.

In the alternative, the Policy violates Ms. Regino's procedural due process rights to a "thorough investigation," notice, and an opportunity to be heard on the issue of whether her daughters are to be socially transitioned. *Supra* 23–24.

Accordingly, the Policy violates Ms. Regino's parental rights as applied.

## II.    MS. REGINO FACES IRREPARABLE HARM

The deprivation of constitutional rights, even for a brief period, "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality op.)). Because Ms. Regino has made a strong showing that the Parental Secrecy Policy violates her fundamental constitutional rights, she has also forcefully "carried [her] burden as to irreparable harm." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (cleaned up).

## III.    THE EQUITIES TIP DECIDEDLY IN MS. REGINO'S FAVOR

A preliminary injunction is appropriate when the plaintiff's harm in the absence of the injunction "outweigh[s] the cognizable hardship (if any) to the [defendants] from issuing the injunction." *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) Here, the equities tip heavily in Ms. Regino's favor.

In cases involving constitutional rights, the equities tip in favor of the plaintiff unless the government can demonstrate that the proposed injunction will "*seriously* hamper significant governmental interests." *Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019) (emphasis added)). The District cannot make that showing here. As Ms. Regino has demonstrated, the governmental interests that underlie the Policy are not compelling and are not served by the Policy.

Moreover, under Ms. Regino's proposed preliminary injunction, the District may continue to socially transition students so long as it notifies parents and obtains their consent. And if the District concludes it has "evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse," *Brokaw*, 235 F.3d at 1019; *Croft*, 103 F.3d at 1126, it

19

may continue to report that to the appropriate authorities, as it is required to do. Accordingly, Ms. Regino's proposed preliminary injunction will not "seriously hamper" any significant governmental interest.

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's American Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation omitted). Ms. Regino has made a strong showing that Parental Secrecy Policy violates her parental rights. Enjoining that violation is thus in the public interest.

Ms. Regino's proposed preliminary injunction will also benefit all parents of children who attend school in the District, not to mention the children themselves. In addition to violating parents' constitutional rights, the Parental Secrecy Policy harms students because it is psychologically unhealthy for children to inhabit different gender identities at home and at school. (Levine Aff. ¶ 12m.) In addition, the Policy impairs parent-child relationships because it creates an adversarial and secretive relationships. (*Id.*) Moreover, the Policy hinders parents' ability to fulfill their responsibilities as caregivers and advocates for their children and deprives children of the support and guidance they need to thrive at a crucial time in their lives.

These harms to the community are ongoing. The Court should grant Ms. Regino's motion for preliminary injunctive and stop them immediately.

## V.    NO BOND SHOULD BE REQUIRED

Finally, due to the facts that the relief sought by Ms. Regino (1) will not require Defendants to expend significant, if any, monetary costs and (2) will vindicate both (a) her constitutional right and (b) the public interest, no bond should be required for entry of her proposed preliminary injunction. *Thomas v. Cnty. of Riverside Sheriff's Dep't*, No. EDCV1001846VAPDTBX, 2011 WL 13224841, at *26 (C.D. Cal. July 7, 2011); *Mercer, Fraser Co. v. Cnty. of Humboldt, Cal.*, No. C 08-4098 SI, 2008 WL 4344523, at *2 (N.D. Cal. Sept. 22, 2008).

## CONCLUSION

For the foregoing reasons, Ms. Regino respectfully requests this Court grant her Motion for Preliminary Injunction and enter the relief requested therein.

Memorandum in Support of Motion for                    Case No.: 2:23-cv-00032-JAM-DMC
Preliminary Injunction

Pursuant to Local Rule 231, Ms. Regino does not wish to present oral testimony at the hearing on her Motion for Preliminary Injunction, but she reserves the right to do so should Defendants so desire. Ms. Regino anticipates one hour will be required for the hearing on the Motion.

Respectfully submitted,


Dated:  January 25, 2023                    **DHILLON LAW GROUP INC.**
                                            **CENTER FOR AMERICAN LIBERTY**

                                            _/s/ Harmeet K. Dhillon_
                                            HARMEET K. DHILLON
                                            MICHAEL A. COLUMBO
                                            MARK TRAMMELL*
                                            JOSHUA W. DIXON
                                            ERIC A. SELL

                                            _Attorneys for Plaintiff_
                                            AURORA REGINO
                                            *Pro Hac Vice Motion forthcoming